Good morning, and welcome to the Ninth Circuit. Before we begin, Judge Nelson and I would like to welcome Judge Don Molloy, District Judge from the District of Montana, who's here helping us out today and tomorrow. Judge Molloy, welcome and thank you. Well, thank you for having me. And we've got several cases submitted on the brief, so I'll just read those out as housekeeping.  Wagner v. Wells Fargo, submitted. Simonelli v. Commissioner of Internal Revenue, submitted. United States v. Cabrera, submitted. We've got four argued cases. We've read your briefs. We look forward to your arguments. The first this morning, Davila v. Barr. When you're ready, Counsel. Good morning, Your Honor. Luther Snavely appearing before the Petitioner, Carla De Villa. I request that three minutes of my time be reserved for rebuttal. Okay, look out for your own time. It counts down. We'll try to help. Very well, Your Honor. May it please the Court. On Friday, the government filed a 28-J letter with the court. I'd like to address that first. In citing matter of AB, the government forgot to mention that General Sessions said, in so many words at page 337 of that opinion, that the unwilling-to-control standard is met if the government in question condoned the private action. The case of Singh v. Barr cited by the government is completely inapplicable to the case now before the court. In Singh, the court took up the issue of when does whistleblowing constitute political activity sufficient to be an expression of political opinion. The court held in that case that the alien's opposition to broad forms of government corruption might be political opinion, but his opposition to isolated corruption or to the abuse of an isolated official usually does not constitute an expression of public opinion. And so that case really has nothing to do whatsoever with whether a so-called rogue official's actions could be imputed to the government. Can I ask about the 28-J letter? Is there any reason for us to consider that? At a minimum, isn't that something that possibly could be considered on remand? But if the BIA didn't rely upon it, we can't look at it, can we? Well, I agree. I agree. So my only point is there's no reason for us to even weigh in to say it does apply here, it doesn't apply here. We just can't consider it, right? I think so. The police officers in Nicaragua condoned Ronald's actions against Carla de Villa. So how much evidence do we have of that? I know we have at one point urged by a neighbor, she calls the police, the police come, she testifies, I believe credibly, that she sees the man paying off and then he goes away. Do we have other evidence of condoning that would help you? No. What we have here is the one incident where, and her testimony, as you know, the IJ found her testimony to be credible and so her testimony should be accepted as true for our purposes as it was with the BIA and the IJ. What happened was, as you said, she complained to the police after about the fourth time where he beat her up and worse, two police officers with the wherewithal to deal with the situation actually went out to her home and if the officers had any doubt about the truthfulness of what she was asserting, those doubts were certainly put to rest when Ronald offered them a bribe not to protect her. So they were with full knowledge of what was going on, with the full ability to protect her if they chose to do so, and with full knowledge they took the bribe and they left. And so I believe this constituted agents of the Nicaraguan government acting under cover of law, giving Ronald their unspoken permission to beat her and rape her. Do we have other evidence in the sense of her testimony that she did not believe, over and above this incident, that the police would not protect her? Well, that's right. The record is replete with her being extremely suspicious and extremely cynical about the police's willingness and ability to protect her, and as it turned out, she was right. And what about the evidence, again, indirect, but the evidence that rather than call the police to protect her daughter, the mother mortgages her home in order to pay for the smuggling to get her out of the country? I don't recall that from the record. If you say so. Yes, you should. Okay. But I don't think that that is relevant to whether the police condoned Ronald's action and whether them condoning Ronald's action. You know, I'm trying to help you out here. I think you've got an argument, and that is if we're trying to figure out what the belief in the community was, it's pretty clear that the mother says, if I'm going to protect my daughter, I'm not going to call the police. I'm going to mortgage my house and use that money to smuggle her out of the country. Well, and also, the government points to steps that the Nicaraguan has supposedly taken to better this situation, but also in the record there is information about how the victims still are vastly underreporting these crimes and so that the people who are being victimized here don't seem to trust the police, as Ms. De Villa did not. Now, if we were to conclude that there is condoning, with respect to both asylum and withholding, do we need to remand on social group? Well, the BIA did not review. Didn't reach the question. Right, right, and so I guess the answer is yes, unfortunately. What about CAP? We don't need social group for CAP. That's true. Well, if it happened, you know, if public official acquiesced to Carla's torture before, there is certainly a chance that it could happen again. So I would argue that you could resolve the CAP issue without remanding to the BIA. So is domestic violence torture? Certainly in this instance it was. Is it torture within the meaning of the law? Well, I would think so. Domestic violence in the 50 states is defined in lots of different ways. Certainly the domestic violence that is expressed in this case would constitute torture. We've got beatings and rapes going on here, and I think that would constitute torture. So there's another question, I think. The 2015 country report shows that Nicaragua has made positive strides in protecting women from domestic abuse, and then you have the credible testimony found by the IJ of the petitioner in this case. So when you have a generalized statement in the country report and specific credible testimony by the applicant, which one controls? The applicant. I mean, here she asked her government for protection at the time that she asked her government for protection, and at the place she asked her government for protection, two agents of the government appeared with the full knowledge of what was going on and the full wherewithal to do something about it and unambiguously refused to help her. I think that is what should trump over, you know, a report of Nicaragua would like to do a better job of helping victims in this situation. Your Honor, may I reserve the reminder of my time? I was just going to suggest. Good morning, Your Honors, and may it please the Court, Michael Heiss on behalf of the Respondent. Substantial evidence in this case supports the agency's finding that the petitioner failed to satisfy her burden of proof that she suffered past persecution or established a well-founded fear of future persecution given that she failed to establish that the government of Nicaragua is unable or unwilling to protect her. What do we make of the unchallenged narrative that she calls the police, the police come, Ronald goes out and pays them off, and they go away? Yes. It sounds as though the police had the opportunity to protect, failed to do so. And the agency acknowledged all of those facts. Why is that insufficient to show acquiescence or indifference by the government? Because the statute speaks of the government, not an individual. Yes, he's a government agent. These were two representatives of the government. Yes, he's a government representative, and I believe Judge Nelson was asking, should the Court consider A, B. In this instance, yes, because the Attorney General is discussing the standard for unable and unwilling, as applies here. It's a question, if the Court is concerned about getting ahead of the agency applying it to this particular case. So what more is she supposed to do? Is she supposed to call them again? When she called them the first time, Ronald goes out and pays them off, and she was subjected to a particularly severe beating for having called them. So she's supposed to call them again to demonstrate that exactly the same thing is supposed to happen again? How many times does she have to do it before she can demonstrate to your satisfaction or our government's satisfaction that the Nicaraguan government is unable or unwilling? Well, as the immigration judge noted and the Board agreed, she had other options. Such as? The government, the Nicaraguan government has made available other options to her. Such as? Such as contacting the local prosecutor, contacting perhaps national law enforcement, pursuing any of the mediation services available. You know, that just strikes me as fantasy. The country conditions reports belie that that is fantasy. You know, I've dealt with country conditions reports for 20 years now, and it's fairly common for the country conditions report to say the government is making strides, and the evidence in front of us is very often, well, they may be making strides somewhere, but they're sure not making strides in the case in front of us. I mean, I see this over and over again. The court has consistently found that the State Department's country reports evidence is compelling, if not the most compelling evidence of country conditions. I do not think that's an accurate description of our jurisprudence. I would be glad. We pay attention to it. It's clearly evidence. But if it's contradicted in the individual case by I called the police, the police did not respond. Yes. That's a different proposition. In this one instance, yes, there was a bribe paid to a local police officer that resulted in the police not aiding her. We're not disputing that that happened. The question is what else could she have done? Are you familiar with our case Bringus-Rodriguez? Of course. And what happened there in terms of alerting the police? Well, that's a very specifically factually different situation in that that matter involved a child. So the question is whether or not a child would be expected to report the abuse the child was suffering. This is not a child. This is an adult that is, of course, in an abusive relationship. But you're saying she's supposed to do it twice, three times? Well, what Your Honor is describing is contacting the same people that failed to help her, whereas she had other options that the Nicaraguan government had made available to her of which she didn't avail herself. There is, as we argue in the brief, and concede in the brief, there is no per se reporting requirement. That was Bringus-Rodriguez clarifying, I'm going to mispronounce this, Ramizadeh, talking about the evidentiary gap that the failure to report creates and what that means. It's not creating a higher burden of proof, but the failure to report is something that the agency can consider in the totality of the circumstances. The totality of these circumstances show that there were other options available to her. She moved to another town. There's no evidence that she contacted the local police there. She didn't contact a prosecutor there. She didn't seek a protective order anywhere. She simply claims that, quote, justice is for sale was her testimony. She testifies truthfully that justice is for sale and that if I go to the police in Nicaragua again, the same thing is going to happen. That's a subjective statement. Of course. And asylum and withholding require objective proof. That was Judge Malloy's question is, what carries the day? We have this country conditions report that suggests that Nicaragua is making strides, and we have an individual that had a very unfortunate incident where the police did nothing to help her on one occasion 13 years ago. That's a classic weight of the evidence question, and applying the substantial evidence standard, this court can't reweigh the evidence. The agency can look at the totality. What do we do with the other evidence that is to say she says, I know, we know that the police, the authorities will not help us? What do we do with the evidence that her mother is so distrustful of the authorities that instead of contacting the authorities, her mother is trying to protect the daughter, she mortgages her home in order to get enough money to get her daughter out of the country? What do we do with that? That's arguably assuming facts, not an evidence, in terms of what the mother's motivation was, in terms of what else motivated the mother to do that, what motivated her to come to the United States. Are you saying she didn't mortgage her home? I'm suggesting the mother's motivation. We don't have testimony from the mother as to everything that she was thinking as to why she did this. What we do know is that the mother sought to protect the daughter. The mother mortgaged her home, used the money to pay a smuggler to get her daughter here. Certainly. We do know further that the mother did not contact the local authorities. Do we know all those things? Yes. Okay. Those are the actual facts, but what's missing from that. I want to make sure that you and I are on the same page with respect to the facts. There's a piece of it. We're almost on the same page. I think Your Honor is a step ahead of me in terms of we have full knowledge of why she did that. Yes, protecting her daughter was a factor. Is it the factor? This is kind of getting into the central reason, a very similar type of analysis. There's a whole host of reasons individuals want to come to the United States. Certainly this individual had a compelling reason to want to avoid further domestic abuse. We're not disputing that that's a reasonable thing to want to get away from. The question is, did she sufficiently avail herself of what the Nicaraguan government was offering to her? No protective order, didn't contact the local police when she moved, didn't contact a local prosecutor, didn't contact a national prosecutor, didn't pursue mediation. She had a lot of other options. And, yes, domestic violence remains an ongoing problem in Nicaragua. Again, no one's disputing that. The country conditions report says so. Now, if this abuse had been inflicted upon her outside of the domestic context, that is to say by a government official or someone with clear acquiescence, would this constitute torture? That would certainly be something the agency would have to consider in the first instance. Well, the agency has denied CAT. Right, the agency didn't make a torture finding. The agency made an acquiescence finding. Well, it denied CAT. Denied CAT, yes, but not based on whether or not she suffered past torture. The agency didn't make a past persecution finding either, specifically whether the harm itself constituted persecution. It was whether or not the sole question that the agency addressed was whether or not the Nicaraguan government was unable or unwilling to protect her. So if we were to conclude that both within the meaning of asylum and withholding and within the meaning of CAT, that the government did not, would not, could not protect her, so if we get over that hurdle, are you saying with respect to CAT, we need to remand to a determination as to whether or not this abuse arose the level of torture? Yes. You question that if this abuse had been inflicted by a government officer, that this would have been or would not have been torture? Again, that's not for my, not within my purview to say. It's the agency's, that's fact finding for the agency in which to engage. Certainly domestic violence is terrible. I believe this individual was raped. And I want to make sure I put a point on it. Does the fact that it's domestic violence rather than violence inflicted by someone else make a difference as to whether it's torture? If I were to say my personal belief, I would say that doesn't make a difference at all. You're representing the government. Right. So it doesn't make a difference. Domestic violence is horrible. I hate it. And does it make a difference in terms of whether it's torture, depending on whether it's inflicted as domestic violence or violence by someone else? Violence is violence. Whether or not it's persecution is the other question. No, I understand. I'm asking not persecution. I'm asking the question of torture. I'd like you to answer the question. Well, persecution and torture are obviously related. Torture is a higher standard than persecution and, again, requires government acquiescence. No, please answer the question. The question is, we have this level of violence inflicted upon this woman. Does it matter? Is it torture or not torture, depending on whether it's domestic violence or violence inflicted by someone else? I don't believe that's the standard. Again, violence is violence. Okay. Got it. I see I'm going over my time. Ultimately, the question here is a weight of the evidence question. We have conflicting statements. We have credible testimony, yes, but that's a subjective belief. The Nicaraguan government is making strides to combat domestic violence, and thus the court should deny the petition. Alternatively, if the court believes that's not the case, there are still several open questions that the agency would need to consider on remand, including whether or not, especially after matter AB, her particular social group remains viable.  Thank you, Your Honor. Your Honor, the question is not weighing of the evidence. The question is, how should the unwilling-to-control standard be applied? And in looking for guidance on how it could be applied, I would look to the regulations for the Convention Against Torture, HCFR 1208.18. This Court has held that there is no rogue official exception for CAT, and there also shouldn't be one for asylum withholding. This Court has held that if a public official at the State or local level would acquiesce in any torture the alien is likely to suffer, this satisfies CAT's requirement that a public official acquiesce in the torture, even if the national government would not similarly acquiesce. I think that acquiesce and unwilling-to-control either mean the same thing or very, very close to the same thing. And I think that the same approach should be applied in asylum and withholding of removal as in CAT. It's more consistent, it's more clear, and it's much, much easier to review. The problem with, does she have to go back two times? Does she have to go back three times? Does she have to go back? Does she have to go to a completely different agency before we decide that she's met the unwilling-to-control standard? Is that it's amorphous, it's speculative, it's completely subjective. One judge may say, okay, three times is enough. Another judge might say, oh, well, no, two is plenty. A third judge might say, well, if the cops don't give you satisfaction, then you should go to a different agency. How do you review that? I think applying it, looking at it the same way that it's looked at as a court does in CAT is a more concise, clear standard that this court can review. I'm over my time. Your Honors, do you have any questions for me? I think not. Thank you. Thank both sides for your arguments. Thank you, Your Honors. Have a good one. Tavia v. Barr, submitted.
judges: W. Fletcher, R. Nelson, Molloy